## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL BRENNSTEINER, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>v.<br><br>INTRASYSTEMS, LLC,<br><br>              Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Paul Brennsteiner ("Plaintiff") brings this Class Action Complaint against Defendant IntraSystems, LLC ("Defendant"), in their individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge, counsel's investigation, and information and belief, as follows:

### INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former patients' ("Class Members," defined *infra*) sensitive information, including personally identifiable information ("PII") like names, addresses, dates of birth, and Social Security numbers, and protected health information ("PHI") like health insurance information, treatments/procedures, date(s) of service, prescription information, and medical device serial number (PHI and PII together, "Private Information").[1]

---

[1]      *See*   https://www.ahn.org/newsroom/press-releases/press-release?pr=ahn-it-vender-notifies-patients-of-home-medical-equipment-and-home-infusion-companies-about-cyber-security-incident (last visited Feb. 6, 2025) (third party vendor IntraSystems, LLC impacted by data breach).

2.      Defendant is a Massachusetts-based, third-party IT firm contracted to host, manage, and secure computer systems for its clients,[2] including for Pennsylvania-based health network Allegheny Health Network ("AHN"). AHN recently reported that its vendor, Defendant IntraSystems, LLC, suffered a data breach exposing hundreds of thousands of AHN patients' Private Information.

3.      Defendant, through AHN, received Plaintiff and Class Members' Private Information in connection with providing services to AHN.

4.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.      On or about January 17, 2025, AHN announced that Defendant IntraSystems, LLC, which managed systems for Defendant's Home Medical Equipment and Home Infusion services, had been accessed by an unauthorized third party ("Data Breach"). The Private Information of 293,900 of individuals is believed to have been exposed by the Data Breach.[3]

6.      Defendant failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its patients' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

---

[2] https://www.intrasystems.com (last visited Jan. 25, 2025).
[3] *See* https://www.post-gazette.com/business/healthcare-business/2025/01/21/data-breach-home-care-patients-allegheny-health-network/stories/202501210060 (last visited Feb. 6, 2025).

7.      Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure its network containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal statutes.

8.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

9.      Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

10.      Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect

the Private Information. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of Plaintiff and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

11.    Plaintiff Paul Brennsteiner is and was, at all times material hereto, a resident and citizen of the Commonwealth of Pennsylvania. He resides in the city of Clairton, Pennsylvania, which is in Allegheny County.

12.    Defendant is a limited liability company with its principal place of business located in Braintree, Massachusetts.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs; the number of members of the proposed Class exceeds 100; and diversity exists because Plaintiff and Defendant are citizens of different states. Subject matter jurisdiction is also based upon the Federal Trade Commission Act ("FTCA"). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.    The Court has personal jurisdiction over Defendant because it maintains its headquarters and principal places of business in this District; conducts significant business in this District, thus availing itself of Massachusetts' markets; has sufficient minimum contacts with Massachusetts; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

15.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*,

a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in, were directed to, and/or emanated from this District; Defendant transacts substantial business and has agents in this District; a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District; and because Defendant resides within this District.

## FACTUAL ALLEGATIONS

### Background

18.    Plaintiff provided, through AHN, Private Information to Defendant in connection with its provision of IT services to AHN (and Defendant's other customers).

19.    The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

20.    Defendant had an obligation to Class Members, including Plaintiff and Class Members, to ensure that their Private Information would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

21.    Plaintiff's and Class Members' Private Information was provided—directly or indirectly—to Defendant with the reasonable expectation that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

22.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

23.    Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's Private Information safe and confidential.

24.     Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

25.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the IT services it provides to its customers, like AHN.

26.     By obtaining, collecting, receiving, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

### The Data Breach

27.     On January 17, 2025, AHN announced that an unauthorized actor gained access to certain files and data stored within its systems beginning on or about October 11, 2024.

28.     The Notice of Data Security Incident posted on AHN's website states:

> FORD CITY, Pa. (Jan. 17, 2025) — Allegheny Health Network (AHN) announced today that an IT vendor – IntraSystems, LLC – responsible for hosting, managing, and securing certain computer systems that support AHN's subsidiary Home Medical Equipment and Home Infusion companies experienced a cyber security incident that led to unauthorized access to those computer systems beginning on Oct. 11, 2024. AHN learned about the cyber event on Nov. 19, 2024.
>
> The impacted systems hosted by IntraSystems contained the information of patients who received the services of AHN's Home Medical Equipment and Home Infusion therapy services, and an unauthorized user was able to obtain some of this information. Once discovered, immediate steps were taken to investigate and secure patient information and stop the unauthorized access to the systems and the data on them. In addition to terminating the unauthorized

access to the affected systems, including immediately taking those systems offline, connections with other systems were turned off to prevent additional unauthorized access. Law enforcement was also notified.

Impacted patients are being notified by IntraSystems in accordance with HIPAA and applicable state law. The affected personal information may have included names, dates of birth, addresses, Social Security numbers, financial account numbers (but no access codes), health insurance identification numbers and other health insurance information, and treatment information including diagnoses, provider information, treatments/procedures, dates of service, prescription information, and medical device serial numbers. AHN is not aware of any actual or attempted identity theft or fraud as a result of this incident.

AHN is taking this matter very seriously and, to help protect patient identities, the network has directed IntraSystems to arrange for identity protection services, including credit monitoring at no charge to all affected individuals. Multiple other corrective actions to respond to the incident and to help ensure an incident like this does not happen again have been taken.[4]

31.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining on behalf of AHN for Plaintiff and Class Members, causing the exposure of their Private Information, such as encrypting the information or deleting it when it is no longer needed.

32.     The hacker accessed and acquired files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

---

[4]     *See*     https://www.ahn.org/newsroom/press-releases/press-release?pr=ahn-it-vender-notifies-patients-of-home-medical-equipment-and-home-infusion-companies-about-cyber-security-incident (last visited Feb. 6, 2025).

33.     Plaintiff further believes Plaintiff's Private Information, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**Defendant Acquires, Collects, and Stores
the Private Information of Plaintiff and Class Members**

34.     Defendant derives a substantial economic benefit from providing IT services to its customers, such as AHN, and as a part of providing that service, Defendant retains and stores Plaintiff's and Class Members' Private Information.

35.     By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the Private Information from disclosure.

36.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

37.     Customers of Defendant's IT services customers (such as AHN), including Plaintiff and Class Members, relied on the concept that vendors that receive their Private Information will keep that Private Information confidential and maintained securely, and use this information for business purposes only, and to make only authorized disclosures of this information.

38.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

39.     Defendant's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of Private Information are Particularly Susceptible to Cyberattacks.**

40.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendant, preceding the date of the Data Breach.

41.     Data thieves regularly target IT vendors like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

42.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[5]

43.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

44.     As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

---

[5] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (https://notified.idtheftcenter.org/s/), at 6.

45.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

46.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially hundreds of thousands of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

47.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

48.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

**Value of Personally Identifiable Information**

49.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[6] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[7]

---

[6] 17 C.F.R. § 248.201 (2013).
[7] *Id.*

50.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[8]

51.    For example, Private Information can be sold at a price ranging from $40 to $200.[9] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[10]

52.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[11]

53.    The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (e.g., patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the health care industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

---

[8] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[9] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[10] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[11] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected.

54.     Between 2005 and 2019, at least 249 million people were affected by health care data breaches.[12] Indeed, during 2019 alone, over 41 million health care records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[13] In short, these sorts of data breaches are increasingly common, especially among health care systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[14]

55.     According to account monitoring company LogDog, medical data sells for $50 and up on the dark web.[15]

56.     "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[16]

57.     A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for health care they did not receive to restore coverage.[17] Almost half of medical identity theft victims lose their health care coverage as a result of the incident, while nearly one-

---

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/.

[13] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.

[14]          https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/.

[15] [15] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

[16] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.

[17] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[18]

58.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—PHI and names—is impossible to "close" and difficult, if not impossible, to change.

59.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[19]

60.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

61.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[18] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN,        https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last visited Jan. 23, 2025).
[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

**Defendant Failed to Comply with FTC Guidelines.**

62.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

63.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

64.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the

---

[20] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

65.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

66.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

67.    Defendant was at all times fully aware of its obligation to protect the Private Information of consumers that is entrusted to it under the FTCA yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendant Failed to Comply with HIPAA.**

68.    Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and

Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

69. On information and belief, Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

70. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

71. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

72. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

73. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

74. HIPAA's Security Rule requires defendants to do the following:

    a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.  Ensure compliance by its workforce.

75.  HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

76.  HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

77.  The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

78.  HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

79.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

80.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

81.     Defendant was at all times fully aware of its HIPAA obligations to protect the Private Information of consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendant Failed to Comply with Industry Standards.**

82.     Experts studying cybersecurity routinely identify IT companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

83.     Some industry best practices that should be implemented by institutions dealing with sensitive Private Information, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

84.     Other best cybersecurity practices that are standard at large institutions that store Private Information include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

85.     Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by

failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

86.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**Defendant Breached Its Duty to Safeguard Plaintiff's and
Class Members' Private Information.**

87.    In addition to its obligations under federal laws, Defendant owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

88.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect consumers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to adhere to industry standards for cybersecurity as discussed above; and

e. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

89.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems, which contained unsecured and unencrypted Private Information.

90.    Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

**Plaintiff and Class Members Suffered Common Injuries and Damages.**

91.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

***Increased and Imminent Risk of Identity Theft***

92.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come as a result of the Data Breach.

93.    The unencrypted Private Information of Class Members will end up for sale on the dark web, if it has not already, because that is the *modus operandi* of cybercriminals that commit

attacks of this type. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

94.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

95.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

96.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

97.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[21]

98.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

99.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[21] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

*Loss of Time to Mitigate Risk of Identity Theft and Fraud*

100.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

101.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

102.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

103.    These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended

---

[22] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

### Diminished Value of Private Information

104.    PII and PHI are valuable property rights.[24] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that Private Information has considerable market value.

105.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[25]

106.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[26,27]

107.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[28]

108.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider,

---

[23] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

[24] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[25] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[26] https://datacoup.com/.

[27] https://digi.me/what-is-digime/.

[28] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

109.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

110.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

111.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network, amounting to hundreds of thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

112.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.**

113.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is

a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

114.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

115.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### Plaintiff Paul Brennsteiner's Experience

116.    Plaintiff Paul Brennsteiner is a patient of or otherwise affiliated with AHN, which provided Plaintiff's Private Information to Defendant as a condition of AHN receiving Defendant's IT services.

117.    At the time of the Data Breach, Defendant retained Plaintiff's Private Information in its system.

118.    On or around January 17, 2025, Plaintiff Brennsteiner was notified by AHN via letter notice of the Data Breach and of the impact to his Private Information.

119.    Plaintiff's Private Information was compromised in the Data Breach and stolen by cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the Private Information.

120.    Plaintiff takes reasonable measures to protect Plaintiff's Private Information. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

121.    Plaintiff stores any documents containing Plaintiff's Private Information in a safe and secure location and diligently chooses unique usernames and passwords for online accounts.

122.    As a result of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. Plaintiff monitors accounts and credit scores and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities.

123.    Plaintiff also suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that, through AHN, was entrusted to Defendant for the purpose of obtaining IT services from Defendant, which was compromised in and as a result of the Data Breach.

124.    Plaintiff suffered lost time, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy.

125.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse relating to Plaintiff's Private Information, especially Plaintiff's name, Social Security number, and PHI, being placed in the hands of criminals.

126.    Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Plaintiff's Private Information was compromised and disclosed as a result of the Data Breach.

127.    As a result of the Data Breach, Plaintiff anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

128.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## CLASS ACTION ALLEGATIONS

129.    Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of all members of the proposed class defined as follows:

> All individuals residing in the United States whose Private Information was compromised in the IntraSystems, LLC Data Breach, including all individuals who received notice of the Data Breach.

130.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

131.    Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

132.    The proposed Class meets the criteria for certification under Federal Rule of Civil Procedure 23.

133.    **Numerosity –** The Class Members are so numerous that joinder of all members is impracticable. Defendant's records, public records indicate at least 293,900 individuals' Private Information was compromised in the Data Breach. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

134.    **Commonality –** There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether Defendant engaged in the conduct alleged herein;

b.   Whether Defendant's conduct violated the FTCA;

c.   When Defendant learned of the Data Breach;

d.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f.   Whether Defendant's data security systems, prior to and during the Data Breach, were consistent with industry standards;

g.   Whether Defendant owed duties to Class Members to safeguard their PII;

h.   Whether Defendant breached their duties to Class Members to safeguard their PII;

i.   Whether hackers obtained Class Members' PII via the Data Breach;

j.   Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

k.   Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

l.   Whether Defendant knew or should have known its data security systems and monitoring processes were deficient;

m.  What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

n.  Whether Defendant's conduct was negligent;

o.  Whether Defendant breached contracts it had with its patients, including Plaintiff and Class Members;

p.  Whether Defendant were unjustly enriched;

q.  Whether Plaintiff and Class Members are entitled to damages;

r.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

135.    **Typicality –** Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

136.    **Adequacy of Representation –** Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

137.    **Predominance –** Defendant has engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

138.    **Superiority –** A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class Members' claims. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

139.    Defendant's failure to secure PII is generally applicable to the Class as a whole, making equitable and declaratory relief appropriate with respect to each Class Member.

140.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

141.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

142.    Plaintiff and Class Members provided their non-public Private Information directly or indirectly to Defendant as a condition of AHN's (and potentially other customers of Defendant) obtaining IT services.

143.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

144.    By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

145.    Defendant had duties to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

146.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the

health care and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

147.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

148.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

149.    Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

150.    Defendant breached its duties, pursuant to the FTCA, HIPAA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

> a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
>
> b.    Failing to adequately monitor the security of its networks and systems;
>
> c.    Allowing unauthorized access to Class Members' Private Information;

d.    Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e.    Failing to remove Plaintiff's and Class Members' Private Information it was no longer required to retain pursuant to regulations; and

f.    Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

151.    Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

152.    Defendant's violation of federal statutes also constitutes negligence per se. Specifically, as described herein, Defendant has violated the FTCA and HIPAA.

153.    Plaintiff and Class Members were within the class of persons the FTCA and HIPPA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statutes were intended to guard against.

154.    Defendant has admitted that the Private Information of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

155.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

156.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The Private Information of

Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

157.    As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

158.    As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

159.    Additionally, as a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

160.    Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

## COUNT II
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

161.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

162.    This count is brought in the alternative to any current or future contract claims that may be brought by Plaintiff, individually or on behalf of the Class.

163.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made by and/or on behalf of Plaintiff and Class Members through its customers (such as AHN), in exchange for providing IT services to its customers (e.g., AHN), for which Defendant collected and maintained Plaintiff's and Class Members' Private Information.

164.    Plaintiff and Class Members conferred a monetary benefit on Defendant, in providing it, or allowing it to be provided through AHN and other of Defendant's IT customers, with their valuable Private Information.

165.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's and Class Members' retained data and used Plaintiff's and Class Members' Private Information for business purposes.

166.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the

other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profit over the requisite security.

167.    Under the principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

168.    Plaintiff and Class Members have no adequate remedy at law.

169.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

170.    Plaintiff and Class Members are entitled to restitution and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and Plaintiff's counsel to represent the Class, pursuant to Fed. R. Civ. P. 23;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.   For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi.     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.     requiring Defendant to conduct regular database scanning and securing checks;

x.      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.     requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal

security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.     requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.     requiring Defendant to meaningfully educate its IT services customers about the threats that they face as a result of the loss of their patients or customers confidential personal identifying information, as well as the steps affected individuals must take to protect themselves;

xv.      requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.     for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the

class, and to report any deficiencies with compliance of the Court's final

judgment;

D.    For an award of actual damages, compensatory damages, and nominal damages,

in an amount to be determined, and for punitive damages, as allowable by law;

E.    For an award of attorneys' fees and costs, and any other expenses, including

expert witness fees;

F.    Pre- and post-judgment interest on any amounts awarded; and

G.    Such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 11, 2025                         Respectfully submitted,


                                                 */s/ Randi Kassan*
                                                 Randi Kassan
                                                 **MILBERG COLEMAN BRYSON PHILLIPS
                                                 GROSSMAN, PLLC**
                                                 100 Garden City Plaza
                                                 Garden City, NY  11530
                                                 Telephone: (516) 741-5600
                                                 rkassan@milberg.com

                                                 Benjamin F. Johns (*pro hac vice* to be filed)
                                                 Samantha E. Holbrook (*pro hac vice* to be filed)
                                                 Andrea L. Bonner (*pro hac vice* to be filed)
                                                 **SHUB & JOHNS LLC**
                                                 Four Tower Bridge
                                                 200 Barr Harbor Drive
                                                 Suite 400
                                                 Conshohocken, PA 19428
                                                 T: (610) 477-8380
                                                 bjohns@shublawyers.com
                                                 sholbrook@shublawyers.com
                                                 abonner@shublawyers.com

                                                 *Counsel for Plaintiff and the Putative Class*